# EXHIBIT A

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

BRANDON OPALKA, an individual,
on behalf of himself and all others
similarly situated,

       Plaintiff,

v.

AMALIE AOC, LTD., a Florida
Limited Partnership,

       Defendant.

_____/

CASE NO.:

**CLASS REPRESENTATION**

**COMPLEX BUSINESS LITIGATION**

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Brandon Opalka ("Plaintiff"), individually and on behalf of all others similarly situated, makes the following class action allegations against Defendant Amalie AOC Ltd. ("Defendant"):

<u>**INTRODUCTION**</u>

1.    Plaintiff brings this consumer class action on behalf of himself and on behalf of the class defined below to redress the deceptive and/or unfair trade practices, acts, and/or omissions employed by Defendant in the marketing and sale of its XCEL Premium line of (purported) passenger car motor oil (the "Product" or "XCEL Oil").

2.    Using deceptive and unfair tactics, Defendant manufactures, markets, advertises, and/or sells XCEL Oil, which is considered "obsolete" by the American Petroleum Institute ("API"), receiving an "API SA" rating. The Product is harmful and ineffective as a motor oil for automotive engines manufactured after 1930.

3.     Despite the fact that it should not be used in automotive engines, Defendant continues to sell the Product, using product packaging conveying the impression that the Product is meant to be used in modern passenger car automotive engines. The label not only misleads reasonable consumers, but also contains flat-out falsehoods.

4.     Defendant knows exactly what it is selling ("cancer"), and why (profit), as one of its executives admitted in a 2003 interview:[1]

> "We would rather not sell non-detergent oil," said Amalie Senior Vice President of Sales and Marketing Dennis J. Madden. "There's no question that it's not good for today's engines. I tell people, 'It's not going to give your car a heart attack. It's more like cancer.' But a lot of people are only concerned with price and they'll buy that stuff because it's 30 cents cheaper. And as long as people are going to buy non-detergent oils, and other companies are going to sell them, we feel like we have to compete."

5.     The Product is sold at major Florida gas station chains including, among others, Sunoco and Marathon, and upon information and belief, is also available at major retailers, such as Sam's Club.

6.     Defendant's deceptive and/or unfair business practices violate Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA"); Florida's Misleading Advertising Law, Fla. § Stat. 817.41; and have unjustly enriched Defendant.

## **PARTIES**

7.     Plaintiff Brandon Opalka is an individual consumer who, at all times material hereto, was a resident of Broward County, Florida. Plaintiff purchased a bottle of XCEL Premium SAE 10W-30 in the Summer or Fall of 2017 from a gas station in Miami-Dade County based on Defendant's label, which led Mr. Opalka to purchase the product based on the belief that it offered

---

[1] T. Sullivan, *California Cracks Down on API SA, SB Oils*, Lube Report Mag. (July 9, 2003), *available at* http://www.synlube.com/LUBEREPORT_CA_SA_SB.htm.

engine protection for his vehicle. Mr. Opalka took Defendant's representations that the Product offered engine protection in passenger car automotive engines in making his purchase and would not have purchased the Product, or would not have paid a premium for it, had Defendant not made the misrepresentations and omissions set forth herein.

8.      Defendant Amalie AOC, Ltd. is a Florida Limited Partnership based in Tampa, Florida, and can be served through its registered agent Kenneth Barkett, located at 1601 McCloskey Blvd., Tampa, Florida 33605.

## JURISDICTION AND VENUE

9.      This is a representative action for injunctive relief and damages, and the amount in controversy exceeds $750,000, exclusive of attorneys' fees and costs.

10.     Jurisdiction exists pursuant to Fla. Stat. § 48.194, because Defendant operates, conducts, engages in, and carries on its business in this State. Defendant further maintains its headquarters in this State.

11.     Venue exists pursuant to Fla. Stat. §§ 47.011, and 47.041, because Plaintiff's causes of action accrued in this County.

## FACTUAL ALLEGATIONS

**A.      The Evolution of Motor Oil and the API Rating System**

12.     Modern motor oils play a key role in the performance and health of automotive engines in cars and trucks. Their main function is to reduce wear and friction in an engine. For example, they improve piston ring sealing, long-term stability and fuel efficiency; as well as inhibit sludge buildup and corrosion.

13.     Motor oil has evolved significantly over time. In the early 1900s, motor oils consisted of nothing more than "base oil"; meaning, they contained no additional ingredients (called "additives").

14.     Starting in the 1940s, the API service classification of motor oils was developed to ensure that consumers chose motor oils that met the performance specification of their engines. The classification, also known as "rating," was typically performance based; meaning, the motor oil had to perform at a certain level in engine tests. These performance qualifications, coupled with the performance specifications of newer engines, in turn drove the development of motor oil through advances in additive technology.

15.     As the ratings increased (from SA to the current SN Plus specification), API declared older motor oil ratings "obsolete"; and stated that they should not be used in newer automobiles due to a risk of engine harm.  One reason for this is that API's motor oil ratings are backwards compatible. In other words, while SA-rated oil will harm a modern engine, SN-rated oil will meet the needs of a vintage engine.

16.     The first API rating, declared "obsolete" in 1947 when API first developed the rating system, is SA-rated motor oil, which was designated only for engines manufactured prior to 1931.  As set forth above, SA-rated motor oil is base oil without any additives and thus cannot meet the demands of engines developed after 1930, much less modern engines. Further, the SA-rating is not required to meet *any* performance or chemical composition tests.

17.     Over time, as the requirements of newer engines became more complex, motor oil similarly evolved. One of the ways by which the industry improved the performance of motor oil was through the inclusion of various additives in commercially available products. Additives play

many roles, such as shelf life enhancers, foam inhibitors, corrosion inhibitors, detergents, dispersants, viscosity modifiers, and friction and wear modifiers.

18.     The evolution of motor oil was not only better, but also necessary to meet the needs of evolving automotive engines. Engine parts moving at much higher speeds under higher temperatures put additional demands and strains on motor oils. Further, the higher temperatures accelerated the oxidation and decomposition of the motor oil, requiring the use of various additives to compensate for these issues.

19.     A number of factors led to the need for additives for post-1930 engines.  In the early 1900s, the national road system (wherein less than 10% of roads were even surfaced) did not permit long periods of high-speed driving. Thus, automobile engines operated under relatively mild conditions, requiring less performance from the motor oil.

20.     Further, early automobiles were not designed for year-round use, and most were stored indoors during bouts of cold weather. Thus, the ability of motor oils to start at low temperatures (lower viscosity oils) was not needed.

21.     Improvements in engine design also required better motor oils. Early engines were poorly designed, and recommended service levels (the number of miles driven before an oil change is needed) could be as low as 16 miles. Engines constantly leaked oil, and car owners needed to add motor oil almost daily. Thus, the long-term stability of motor oil was less important since it was being changed so frequently.

22.     A major impetus for the development of motor oil (and the move from an SA- to SB-rating) occurred between 1930 and 1950, when the petroleum industry introduced solvent refining technology for motor oil. This process improved the viscosity index of oils, but at the cost

1148771

of removing some of the naturally occurring anti-oxidation properties of the oil (which protected against deterioration). Thus, oxidation inhibitors were added to motor oils to compensate.

23.     Other gasoline additives introduced during this time similarly increased the tendencies of engines to corrode and collect deposits. Thus, anti-corrosion and anti-sludge additives became commonplace. Before it was deemed obsolete, the SB-rating was appropriate for vehicles manufactured before 1951.

24.     Engines evolved in the 1960s to require additional protections. New API performance standards were introduced (SC- and then SD-ratings), which led lubricant manufacturers to develop new additive packages. Additive treatments were added to control sludge, rust, corrosion and wear, and cleanliness for short trip, stop-and-go driving.

25.     This continued into the 1970s and 1980s, when newer API performance standards led to even more sophisticated additive packages. This time period saw the API SE-rating (additive packages to meet emissions regulations and long-distance high-speed driving), SF-rating (higher speed additives due to increased speed limits and longer engine maintenance intervals), and SG-ratings (additional dispersants).

26.     The performance standards have been updated numerous times in the last twenty years, leading to more sophisticated additive packages. The current specification is SN+, adopted in 2018.

27.      As the rating evolved, older ratings continued to be declared "obsolete." Indeed, API declared SA-rated oil "obsolete" on the first day they introduced the standards in the 1940s. The following timeline is illustrative:

1148771



28.     To meet the newer API-rating performance tests, today's motor oils contain many additives serving several purposes. To create the motor oil, base oil is blended with the additives. Typical additives include calcium, magnesium, phosphorus, zinc, molybdenum, barium, boron, silicon, potassium, titanium, and sodium.

29.     Anti-wear additives (such as phosphorus and zinc) coat the surfaces of engine components with thin solid films and help prevent the metal parts from coming into contact with one another. These are so important that the current API SN-rating, in addition to various performance tests, also requires between 600 and 800 ppm of phosphorus be present in the oil.

30.     Friction reducers (such as molybdenum) help improve fuel economy. Friction consumes energy produced by the engine that would otherwise go toward propelling the vehicle.

31.     Detergent additives (which may include calcium, sodium, and/or magnesium) clean oil deposits that would otherwise create sludge on important engine parts. Such sludge can block key oil passages, undermining the oil's ability to lubricate and protect the engine. Detergent additives also increase fuel efficiency for the same reasons.

32.     These are a just a few examples of the roles of additives in modern motor oil; other additives serve a variety of other roles.

1148771

33.     Typically, lubricant manufacturers purchase additive packages from additive suppliers and then blend the additive package with the base oil. Additive formulation science is a very rigorous and expensive undertaking (which increases each time a new performance test standard is adopted). Thus, additive packages are quite costly for lubricant manufacturers. Typically, the more current API specification for which an additive package has been improved, the more costly the additive package.

C.     **SA-Rated Motor Oil Such as XCEL Premium is Obsolete, Harmful and Ineffective as a Motor Oil in Post-1930 Engines**

34.     Simply put, SA-rated obsolete oils (such as Defendant's Product), developed nearly a century ago, are not suitable as automotive oils in cars with post-1930 engines. As noted by the Petroleum Quality Institute of America, a trade association, "SA engine oils…will do damage to nearly all cars currently on the road."[2]

35.     This obsolescence is due primarily to the Product's lack of, and/or inadequate amount of, various additives. While Defendant's Product may be suitable to protect cars nearly a century old, it is wholly inadequate and harmful to almost every car currently on the road.

36.     As set forth above, additive-enhanced motor oils are critical for the health, stability, and efficiency of modern automotive engines. Defendant's Product can lead to catastrophic engine failure, and will certainly affect the health, durability, and efficiency of a modern automotive engine over time. As Defendant's Senior Vice President of Sales and Marketing explained, "[t]here's no question that it's not good for today's engines…It's not going to give your car a heart attack. It's more like cancer."

---

[2] PQIA Website, *Are You Running Your Car on Cake and Cola* (2012), avail. at http://www.pqiamerica.com/cakecola.html.

37.     Defendant's 'cancer in a bottle' Product serves no justifiable use in modern automotive engines, is by definition "obsolete," and is worthless. The financial costs incurred due to reduced fuel efficiency alone would deter any reasonable consumer who might otherwise be tempted by the prospect of saving less than a dollar. Simply put, Defendant's Product does not do what motor oil is supposed to do: protect an automotive engine.

**D.     Defendant's Deceptive, Unfair, and/or Illegal Practices**

38.     Defendant engages in the deceptive, unfair and illegal practice of marketing, selling, and causing to be manufactured, SA-rated obsolete motor oil without adequately disclosing that this product is unsuitable for (and can harm) modern automotive engines.

39.     The Product's front label is shown below:[3]

---

[3] Defendant makes this motor oil in different viscosity grades (e.g., 10W-40, 10W-30, 20W-50, 15W-40) and, upon information and belief, the product packaging for the different viscosity grades is identical except for the grade itself.

1148771



40.     The omissions on the Product's front label (displayed to the consumer) are
extensive. Among other omissions, there is nothing to indicate that the Product contains only base
oil, without the additives necessary to perform as a functional motor oil in modern automobiles or
that the product should not be used in automotive engines manufactured after 1930. There is also
nothing to indicate that the Product is "obsolete" or harmful to post-1930 engines.

1148771

41.     Instead, the front label deceives the reasonable consumer into thinking that the Product is an appropriate motor oil for passenger cars. For example, the front label:

a. Uses the same or similar SAE nomenclature (10W-30, 10W-40, etc.) found on non-obsolete motor oil products, which comprise the overwhelming majority of motor oil products in the market.

b. Describes the Product as "motor oil," leading reasonable consumers to believe that it fulfills the role of motor oil in automotive engines.

c. Describes the Product as "Premium" and "Special," leading reasonable consumers to believe that it is better than average motor oil.

d. Contains the phrase "Protects like no other," leading reasonable consumers to believe that the Product not only protects automotive engines but is superior to all other motor oil products.

e. Is called "XCEL" motor oil, in a font suggestive of "accelerating" or speed, leading reasonable consumers to believe in the Product's quality and suitability for automotive engines.

f. Contains a checkered flag similar to many current specification motor oil bottles, suggestive of auto racing which leads reasonable consumers to believe that the Product is appropriate for use in modern automobiles, and of a higher than ordinary quality.

42.     Indeed, nothing on the front label indicates that the Product is any different than the current API-specification motor oil typically offered to consumers. The only apparent difference between the Product and other, non-harmful motor oils, is the price, as the Product is cheaper than current-specification motor oil.

1148771

43.     A reasonable consumer would believe and expect that the Product is suitable for use in modern passenger car automotive engines, and would actually lubricate and protect such engines, when in fact the opposite is true. No reasonable consumer would choose to save a dollar (or less) on motor oil to risk harm to their automobile.

44.     Defendant fails to adequately disclose to consumers the obsolete nature of the Product and the dangers the Product poses to the very automobiles its customers are trying to protect by purchasing it.

45.     Defendant buries what purports to be a "caution" (which in insufficient even if it were placed on the front label) on the back of the Product label, below and in smaller font than other misleading and/or false statements, where no reasonable consumer would encounter them.

1148771

46.     The following photograph illustrates the relative size of text between the front and back labels:



1148771

47. Buried at the bottom of the back label, in the smallest print anywhere on either label (front or back), is the statement: "CAUTION: This oil is rated API SA. It contains no additives. It is not suitable for use in most gasoline powered automotive engines built after 1930. Use in modern engines may cause unsatisfactory engine performance or equipment harm."[4]

48. Defendant conceals this language by rendering it in small font and restricting it to the Product's back label, which is not visible when the products are on store shelves.

49. Reasonable consumers, including Plaintiff, do not read this fine print — and even if they did, it is ambiguous (particularly when read in conjunction with the rest of the label's representations), and fails to adequately disclose the dangers of Defendant's Product.

50. Since motor oil is a basic commodity, reasonable consumers do not read the back label unless they are alerted to the risk of harm associated with a particular motor oil, and instead choose motor oil based on its viscosity grade (10W-30, 10W-40, etc.) and price. As noted by one oil company executive assessing the impact of other state laws requiring additional disclosures for "obsolete" oil: "I don't think [the additional disclosures are] going to have an impact at all…How many people pick up a container and read the label on it?" *See supra* fn. 1. In the same interview, one of Defendant's own executives similarly expressed skepticism that label disclosures will alter consumer behavior; rather, price was the determinative factor. *Id.*

51. The back label contains no adequate warning and uses none of the signals commonly understood to indicate a warning. It is intentionally misleading at best, and further directs a consumer's attention away from the miniscule 'Caution' language buried at the label's bottom. In addition to most of the omissions and representations applicable to the front label (*see*

---

[4] Prior to 2016, Defendant's product did not contain even this inadequate and hidden statement. Instead, the label contained a reference to the API Service category only (e.g., API Service SA).

14

1148771

*supra* ¶¶ 39-42), the back label contains additional misrepresentations. For example, the back label:

    a. Describes the Product as "multi-grade [and] highly refined" suggesting to reasonable consumers that the Product is not only of a quality suitable for use in customer's automotive engines, but was designed for use in such engines, and is in fact superior to other motor oil products in the market.

    b. Describes the Product as a "general purpose automotive oil," which is another false statement leading reasonable consumers to believe that the Product is suitable for use in typical (i.e., post-1930) automotive engines.

    c. Describes the Product as an "economical quality blended lubricant," which is another false statement leading reasonable consumers to believe that the Product is of the same quality as other motor oils (that are suitable for use in automotive engines).

    d. Claims the Product is "formulated…to provide protection against oxidation," leading reasonable consumers to believe that the Product was designed or supplemented in some way to provide anti-oxidation properties.

    e. Claims the Product is "formulated…to provide protection against…corrosion of engine parts," which is another false statement leading reasonable consumers to believe that the Product was design or supplemented in some way to provide anti-corrosion properties.

    f. Claims the Product "provides excellent and durable lubrication for automobile and truck engines," which is another false statement leaving reasonable consumers to believe that the Product does just that for automotive engines.

1148771

g.  Claims the Product is "[r]ecommended for older cars," leading reasonable consumers to believe that the Product would not harm newer cars but is simply 'recommended' for older cars.

h.  Uses the phrase "older cars," which reasonable consumers would not interpret to mean cars with engines manufactured prior to 1931.

52.  Notably, the "multi-grade" claim is untrue and contradictory. By definition, API SA-rated oil (such as this Product) cannot be a "multi-grade" product. Multi-grade oil requires the use of viscosity modifier additives, and, as the tiny print on the bottom of the back label notes, Defendant's Product is additive-free.

53.  Thus, while the front label's omissions and misrepresentations suffice to deceive reasonable consumers into buying the Product, even consumers who read the back label would be similarly misled. The back label uses bullet points, which not only draw attention away from the small "CAUTION" language but contain content directly at odds with the purported warning.

54.  Thus, the small, ambiguous, and incomplete "caution" on the back label is further concealed by its placement below misleading and contradictory messages regarding the Product in larger font.

55.  Defendant's Product does not offer motor oil protection in Plaintiff and the Class Members' automobiles. Defendant knows full well that its Product does not serve any market or segment of the consumer population.

56.  As noted previously, Defendant admitted in 2003 that the Product was being purchased by consumers only due to the slight discount ("30 cents") compared to products that would actually protect a modern engine. Of course, to market their worthless (or overpriced)

16

product, Defendant must dupe consumers into thinking they are actually buying a quality product, which is the purpose of the Product's deceptive, misleading, and false label.

57.     Defendant's motivation is simple: greed. Given that the Product requires no additives, Defendant does not need to spend money on current technology additive packages, manufacturing, or testing. This allows Defendant to reap huge profits by enticing unknowing customers with the Product's slightly under-market price. However, this scheme only works if Defendant leads the Class to believe that the Product is suitable and non-obsolete oil which will not harm to consumers' automobiles.

**E.     Factual Allegations as to Plaintiff**

58.     In the Summer or Fall of 2017, Plaintiff purchased a bottle of XCEL Premium SAE 10W-30 from a gas station in Miami-Dade County.

59.     Plaintiff purchased the Product based on the label's deceptive, unfair, and/or illegal omissions and misrepresentations detailed herein.

60.     As a direct and proximate result of Defendant's deceptive, unfair, and/or illegal practices, Plaintiff (like all Class Members) suffered a loss of money and actual damages in the amount of the purchase price. In today's market, where modern API-rated oils are backwards compatible and nearly zero cars on the road were manufactured before 1931, Defendant's Product is worthless.

61.     Plaintiff (like all Class Members) was thus injured in his property by purchasing a worthless product that he would not have paid for absent Defendant's deceptive and unfair acts and omissions.

1148771

62.     Florida's consumer protection laws are designed to protect consumers such as Plaintiff and the Class from exactly these types of deceptive and unfair trade practices and/or false advertising.

63.     Plaintiff therefore brings the claims alleged herein to halt Defendant's unfair and deceptive practices, false advertising, and unjust enrichment and to obtain compensation for the losses suffered by Plaintiff and all Class Members.

## CLASS REPRESENTATION ALLEGATIONS

64.     Plaintiff brings this class action pursuant to Rules 1.220(b)(2) and 1.220(b)(3) of the Florida Rules of Civil Procedure on behalf of himself and all members of a Class defined as:

> **All persons in Florida who have a post-1930 automobile, and have purchased, an 'XCEL Premium Motor Oil' Product in Florida for use in their automobile.**

65.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

66.     Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers or directors, or any of them. Also excluded from the proposed Class are the Court, the Court's immediate family, and Court staff.

### *Fla. R. Civ. P. 1.220(a) Factors*

67.     **Numerosity:** Membership in the Class is so numerous that separate joinder of each member is impracticable. The precise number of Class Members is unknown at this time but can

1148771

be readily determined from Defendant's records. Plaintiff reasonably estimates that there are thousands of members of the class.

68.     **Existence and Predominance of Common Questions of Law and Fact:** Rule 1.220(a) is satisfied in that Plaintiff's claims raise questions of law or fact common to the questions of law or fact raised by the claims of each Class Member. Further, Rule 1.220(b)(3) is satisfied in that these common questions of law or fact predominate over those affecting only individual Class Members. Included within these common questions are:

a.   Whether Defendant's representations regarding the safety and suitability of its XCEL-branded motor oils are true;

b.   Whether Defendant failed to adequately disclose that the Product was not suitable for use in automotive engines manufactured after 1930;

c.   Whether the content of the front label (*see supra* ¶¶ 39-42) was likely to, and did, deceive reasonable consumers and lead them to believe that the Product was suitable for use in ordinary automotive engines;

d.   Whether the small print statements on the back label of the Product were sufficient to alert reasonable consumers to the true nature of the Product;

e.   Whether Defendant's uniform representations and omissions (on the Product label) constituted deceptive acts in violation of FDUTPA;

f.   Whether Defendant's sale and marketing of the Product constituted an unfair practice in violation of FDUTPA;

g.   Whether Defendant's uniform advertisements (on the Product label) violated Florida's Misleading Advertising Law, Fla. Stat. 817.41;

1148771

h.   Whether Defendant's purported violation of Florida's Misleading Advertising Law constitutes a *per se* violation of FDUTPA;

i.   Whether Defendant studied or tested its label and the effect of its labels on consumers' perceptions;

j.   Whether Defendant studied the susceptibility of consumers;

k.   The cost to Defendant to manufacture, distribute, market and sell its Product compared to the revenue it received from its sales;

l.   Whether Defendant was unjustly enriched by its sale of the Product;

m.   Whether Defendant's products are worthless;

n.   Whether Plaintiff and the Class Members are entitled to damages, and what is the proper measure of Plaintiff's and the Class Members' loss;

o.   Whether Plaintiff and Class Members are entitled to attorneys' fees and expenses, and in what amount; and

p.   Whether Plaintiff and the Class Members are entitled to declaratory, injunctive, and/or other equitable relief.

69.   **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class purchased obsolete, ineffective, harmful, and deceptively labeled Product manufactured and marketed by Defendant and were subjected to Defendant's common course of conduct (materially uniform product packaging).

70.   **Adequacy of Representation:** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained counsel highly experienced in complex consumer class action litigation (including litigation related to obsolete motor oil) and

1148771

intends to prosecute this action vigorously. Plaintiff is a member of the Class described herein and does not have interests antagonistic to, or in conflict with, the other members of the Class.

### *Fla. R. Civ. P. 1.220(b)(2) Factors*

71.     Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole.

72.     Injunctive relief is necessary to prevent further deceptive and unfair business practices by Defendant. Money damages alone will not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to implement its deceptive and unfair policies.

### *Fla. R. Civ. P. 1220(b)(3) Factors*

73.     **Common Issues Predominate:** As set forth in detail herein above (*see supra* ¶ 67), common issues of fact and law predominate because all of Plaintiff's FDUTPA, Misleading Advertising, and Unjust Enrichment claims are based on Defendant's deceptive and/or unfair common course of conduct. Whether Defendant's conduct is likely to deceive an objective consumer acting reasonably under the circumstances is common to all members of the Class and is the predominate issue, and Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

74.     **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

1148771

a. Given the size of the claims of individual Class Members, as well as the resources of Defendant, few Class Members, if any, could afford to seek legal redress individually for the wrongs alleged herein;

b. This action will permit an orderly and expeditious administration of the claims of Class Members, will foster economies of time, effort, and expense and will ensure uniformity of decisions;

c. Any interest of Class Members in individually controlling the prosecution of separate actions is not practical, creates the potential for inconsistent or contradictory judgments, and would create a burden on the court system;

d. Upon information and belief, there is no current pending litigation against Defendant to which any Class Member is a party involving the subject matter of this suit;

e. Concentration of the litigation within this forum is desirable, as the Class involves Florida purchases and (upon information and belief) a significant amount of the Defendant's statewide sales occurred in this forum;

f. This action presents no difficulties that will impede its management by the Court as a class action;

g. Without a class action, Class Members will continue to suffer damages, Defendant's violations of law will proceed without remedy, and Defendant will continue to reap and retain the substantial proceeds derived from its wrongful and unlawful conduct. Plaintiff and Class Members have suffered damages as a result of Defendant's deceptive, unfair, and unlawful conduct.

75.     **Notice to the Class:** Notice can be accomplished by publication for most, if not all, Class Members.

76.     The claims asserted herein are applicable to all Class Members throughout the State of Florida who purchased Defendant's obsolete, harmful, and deceptively marketed, advertised, and labeled Product.

## CLAIMS FOR RELIEF

77.     Based on the foregoing allegations, Plaintiff's claims for relief include the following:

## COUNT I
### Violations of the Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. § 501.201, *et seq.*
### (deceptive acts or practices)

Plaintiff hereby incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

78.     Plaintiff and the Class are "consumers" within the meaning of Part II of Chapter 501, Florida Statutes, relating to Florida's Deceptive and Unfair Trade Practices Act.

79.     Plaintiff and the Class are "aggrieved" persons under § 501.211, Fla. Stat., and so have standing to pursue this claim.

80.     Defendant is a "person" or "entity" as used in FDUTPA.

81.     Pursuant to FDUTPA, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

82.     Within four years prior to the filing of this complaint and continuing to the present, Defendant, in the course of trade and commerce, engaged in unconscionable, unfair, and/or deceptive acts or practices harming Plaintiff and the Class, as described herein.

1148771

83.     Plaintiff and the Class Members purchased Defendant's Product as part of a consumer transaction.

84.     Defendant engaged in deceptive conduct in violation of FDUTPA when it made representations and/or omissions regarding the quality and/or suitability of its Product that it markets and sells that are likely to mislead consumers acting reasonably under the circumstances, to the consumer's detriment.

85.     Defendant further engaged in deceptive conduct by offering for sale a product that it knew had no suitable purpose for customers. In fact, Defendant knew that its Product would fail to adequately protect the automotive engines of all customers who purchased and used the Product.

86.     Reasonable consumers would, as a result of Defendant's misrepresentations and omissions, be misled and believe that the Product was suitable for use in their automobiles.

87.     Defendant's representations and omissions (as detailed in ¶¶ 38-57, *supra*) are likely to mislead reasonable consumers and cause them injury.

88.     As a direct and proximate result of Defendant's deceptive conduct, Plaintiff and the Class Members have suffered damages by purchasing a worthless product that offered no 'motor oil' protection for their automotive engines. Alternatively, Plaintiff and the Class Members have suffered damages by paying a premium for Defendant's product that they would not have otherwise spent, and for which they did not receive value.

89.     Plaintiff and the Class Members have been injured in their property due to Defendant's deceptive acts alleged herein. The injury consists of purchasing a worthless product for which they would not have paid in the absence of these deceptive acts. This injury is of the type Fla. Stat. § 501.201, *et seq.*, was designed to prevent and directly results from Defendant's deceptive and unlawful conduct.

24

1148771

90.     In addition to actual damages, Plaintiff and the Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. § 501.201, *et seq.*

91.     Specifically, Section 501.211(1), Florida Statutes, states:

Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

**COUNT II**
**Violations of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. § 501.201, *et seq.***
**(unfair acts or practices)**

Plaintiff hereby incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

92.     Plaintiff and the Class are "consumers" within the meaning of Part II of Chapter 501, Florida Statutes, relating to Florida's Deceptive and Unfair Trade Practices Act.

93.     Plaintiff and the Class are "aggrieved" persons under § 501.211, Fla. Stat., and so have standing to pursue this claim.

94.     Defendant is a "person" or "entity" as used in FDUTPA.

95.     Defendant further violated FDUTPA by engaging in unfair practices against Plaintiff and the Class.

96.     Given the unsuitability of Defendant's Product for use in automobiles manufactured after 1930, Defendant's sale of the Product, especially accompanied by the misrepresentations and/or omissions described herein, is a practice that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Defendant has been preying

25

upon individuals with limited income offering a low-price product, by deceiving them into paying for an unsuitable product.

97.     Indeed, Defendant's own executives admitted in interviews that the Product is dangerous to all their customers' engines, and that the only reason they sell the Product is that confused customers will purchase it due to its low price.

98.     The practices described herein also offend established public policy regarding the protection of consumers against companies, like Defendant, who engage in unfair methods of competition.

99.     Defendant's conduct, which caused substantial injury to Plaintiff and the Class could have been avoided and is not outweighed by countervailing benefits to any consumers or competition.

100.     Defendant's business acts and practices are also unfair because they have caused harm and injury-in-fact to Plaintiff and Class Members and for which Defendant has no justification other than to increase, beyond what Defendant would have otherwise realized, its market share and revenue from sale of the Product.

101.     Defendant's conduct lacks reasonable and legitimate justification. Defendant has benefited from such conduct and practices while Plaintiff and Class Members have been misled as to the nature and integrity of the Product and have lost money, including the purchase price of the Product.

102.     In addition, Defendant's *modus operandi* constitutes an unfair practice in that it knew (or must have known) that consumers care about maintaining their vehicles and the performance of the vehicles, but are unlikely to be aware of and/or able to detect the means by

which Defendant was conducting itself in a manner adverse to its commitments and its customers' interests.

103.     While Defendant conveyed the impression to reasonable consumers that its Product was safe and effective for use in consumers' automobiles, in actuality the Product is not suitable for use in the vehicles driven by its customers, and does not provide the protection that is expected of motor oils in modern automotive engines.

104.     The practices complained of herein are not limited to a single instance but were rather done pervasively and uniformly at all times as against Plaintiff and the Class.

105.     As a direct and proximate result of Defendant's unfair conduct, Plaintiff and the Class Members have suffered damages.

106.     Plaintiff and the Class Members have been injured in their property by reason of Defendant's unfair acts alleged herein. The injury consists of purchasing a worthless product that they would not have paid for in the absence of these unfair acts. This injury is of the type Fla. Stat. § 501.201, *et seq.*, was designed to prevent and directly results from Defendant's unfair and unlawful conduct. Alternatively, Plaintiff and the Class Members have suffered damages by paying a premium for Defendant's product that they would not have otherwise spent and for which they did not receive value.

107.     In addition to actual damages, Plaintiff and the Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. § 501.201, *et seq.*

108.     Specifically, Section 501.211(1), Florida Statutes, states:

Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

27

<u>**COUNT III**</u>
**Violations of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. § 501.201, *et seq.***
**(unlawful misleading advertising)**

Plaintiff herby incorporates by reference paragraphs 1 through 76 and paragraphs 117 through 124 as if fully set forth herein.

109.    Plaintiff and the Class are "consumers" within the meaning of Part II of Chapter 501, Florida Statutes, relating to Florida's Deceptive and Unfair Trade Practices Act.

110.    Plaintiff and the Class are "aggrieved" persons under § 501.211, Fla. Stat., and so have standing to pursue this claim.

111.    Defendant is a "person" or "entity" as used in FDUTPA.

112.    Defendant further violated FDUTPA by violating a "statute…which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. 501.203(3)(c). Here, Defendant violated Florida's Misleading Advertising Law (Fla. Stat. 817.41), as described in Count IV of this Complaint, *infra*.

113.    Defendant's misrepresentations, omissions, deceptive acts, unfair practices, and/or violations of other rules or statutes, as described herein as violating FDUTPA, would deceive an objectively reasonable consumer.

114.    As a result of Defendant's misrepresentations, omissions, deceptive acts, unfair practices, and/or violations of other rules or statutes, Plaintiff and the Class Members suffered actual damages by losing money. Defendant's Product was worthless and thus the Plaintiff and Class Members' damages are the purchase price of the Product. Alternatively, Plaintiff and the Class Members have suffered damages by paying a premium for Defendant's product that they would not have otherwise spent and for which did not receive value.

1148771

115.    In addition to actual damages, Plaintiff and the Class are entitled to declaratory and

injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. § 501.201, *et*

*seq.*

116.    Specifically, Section 501.211(1), Florida Statutes, states:

Without regard to any other remedy or relief to which a person is entitled, anyone
aggrieved by a violation of this part may bring an action to obtain a declaratory
judgment that an act or practice violates this part and to enjoin a person who has
violated, is violating, or is otherwise likely to violate this part.

## COUNT IV
### Violations of the Florida Misleading Advertising Law
### Fla. Stat. § 817.41, *et seq.*

Plaintiff herby incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

117.    Through the misrepresentations and omissions made on Defendant's Product

packaging regarding the suitability of the Product's use in automobiles, Defendant unlawfully

disseminated or caused to be made misleading advertisements in Florida, in violation of Fla. Stat.

817.41.

118.    Though described above (*see supra* ¶¶ 38-57), Plaintiff reiterates the specific

circumstances surrounding Defendant's misleading advertising:

    a.   ***Who:*** Defendant made (or caused to be made) the material misrepresentations

       and omissions described herein. Plaintiff is unaware, and therefore unable to

       identify, the true names and identities of those individuals employed (or formerly

       employed) by Defendant who are responsible for drafting the language

       comprising the false and/or misleading advertisements.

    b.   ***What:*** Defendant's product packaging made material misrepresentations and

       omissions, such as:

1148771

i.  the front and back labels[5] use the same or similar SAE nomenclature (10W-30, 10W-40, etc.) found on non-obsolete motor oil products, which comprise the overwhelming majority of motor oil products in the market;

ii.  the front and back labels describe the Product as "motor oil," when it in fact does not fulfill the role of motor oil in automotive engines, or that it meets the current definition of what is considered "motor oil";

iii.  the front and back labels describe the Product as "Premium" and/or "Special," whereas it is in fact far worse than average motor oil;

iv.  on the front and back label, the Product is called "XCEL" motor oil, in a font suggestive of "accelerating" or speed, implying the Product's quality and suitability for automotive engines;

v.  the front label contains the phrase "Protects like no other," whereas in fact the Product is far inferior to "other" motor oils and does not offer protection even remotely comparable to "other" motor oils. The Product is in fact not of a type equal to or greater than brand-name current API specification motor oil;

vi.  the front label contains a checkered flag similar to current specification motor oil bottles, suggestive of auto racing which indicates that the Product is appropriate for use in modern automobiles (when it is in fact not), and again indicating that the Product is comparable to brand name current API specification motor oil;

---

[5] Label is synonymous with product packaging as used throughout this Complaint.

vii.   nothing on the front label indicates that the Product contains only base oil, that the Product does not contain additives necessary to perform as a functional motor oil in modern automobiles, that the Product should not be used in automotive engines manufactured after to 1930, or that the Product is "obsolete" or harmful to post-1930 engines;

viii.   the back label describes the Product as "multi-grade [and] highly refined," falsely conveying that the Product is not only of a quality suitable for use in customer's automotive engines, but was designed for use in such engines, and is in fact superior to other motor oil products in the market;

ix.   the back label describes the Product as a "general purpose automotive oil," when it is in fact not suitable for use in automotive engines;

x.   the back label describes the Product as an "economical quality blended lubricant," whereas the Product is actually not of the same "quality" as other motor oils, and is not suitable for use in automotive engines;

xi.   the back label claims the Product is "formulated…to provide protection against oxidation," whereas the Product in was not designed or supplemented in some way to provide anti-oxidation properties;

xii.   the back label claims the Product is "formulated…to provide protection against…corrosion of engine parts," whereas in fact the Product was not designed or supplemented in some way to provide anti-corrosion properties;

xiii.   the back label claims the Product "provides excellent and durable lubrication for automobile and truck engines," whereas in fact the exact opposite is true;

31

1148771

xiv.  the back label claims the Product is merely "[r]ecommended" for older cars, whereas in fact the Product should not be used in post-1930 automobiles;

xv.  the back label fails to disclose the lack of additives or SA specification in the oil; and

xvi.  the back label uses the phrase "older cars," which reasonable consumers would not interpret to mean cars with engines manufactured prior to 1931.

c.  *Where:* The false advertising occurred on Defendant's product packaging which were transmitted, displayed, and/or occurred throughout the State of Florida.

d.  *When:* Upon information and belief, Defendant engaged in the false advertising detailed herein continuously during the Class Period.

e.  *Why:* Defendant made the false advertisements with the intent to induce Plaintiff and the Class to rely upon them and purchase the Product.

119.  The misrepresentations and omissions as to the suitability of Product for use in automobiles are material to Plaintiff, the Class Members, and the average consumer.

120.  Defendant knew or should have known (through the exercise of reasonable care or investigation) that the advertisements were false, untrue, and/or misleading. Indeed, Defendant (while carefully not naming their actual Product) admitted that SA-rated motor oils were harmful in a 2003 interview.

121.  Defendant's misrepresentations and omissions were designed and intended, either directly or indirectly, to obtain money from Plaintiff and the Class Members under false pretenses by inducing them to purchase Defendant's Product. Defendant intended that the representations would induce Plaintiff and the Class Members to rely upon it and purchase Defendant's Product.

122.    Plaintiff and the Class Members relied to their detriment on Defendant's false advertising (namely, the content of the Product's label), by purchasing the Product that they would not otherwise have purchased.

123.    Plaintiff and the Class Members suffered injury in justifiable reliance on Defendant's false advertising; namely they lost money by purchasing a product that they would not otherwise (but for the false advertising) have purchased.

124.    Defendant obtained the benefits of its misleading advertising.

125.    Pursuant to Fla. Stat. 817.41, Plaintiff and the Class Members are entitled to costs, reasonable attorney's fees, and actual damages.

## COUNT V
## Unjust Enrichment

Plaintiff incorporates paragraphs 1 through 76 as if fully set forth herein.

126.    No contract existed between Plaintiff or Class Members and Defendant.

127.    Defendant received certain monies as a result of its uniform deceptive marketing of the Product (by way of the product packaging / label).

128.    Plaintiff and the Class conferred a benefit on Defendant by purchasing the Product, and Defendant has knowledge of this benefit and has voluntarily accepted and retained the benefit conferred upon it. It would be inequitable for Defendant to retain this benefit.

129.    As noted above, Defendant in 2003 stated that the Product was harmful to its customers' automobiles and that Defendant merely sold it in order to obtain a financial gain at the expense of the harmed consumer.

130.    Plaintiff and each Class Member are entitled to an amount equal to the amount they enriched Defendant and for which Defendant has been unjustly enriched, including but not limited

to the value of the additives Defendant retained by failing to include them in the Product such that the Product failed to offer engine protection in passenger car automotive engines.

**TOLLING OF ANY APPLICABLE STATUTE OF LIMITATIONS**

131.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

132.    Plaintiff's purchase of the Product falls within FDUTPA's 4-year statute of limitations. However, some Class Members' last purchase of the Product may have occurred more than four years prior to the filing of this Complaint.

133.    Any statute of limitations applicable to Plaintiff and/or Class Members' claims is tolled due to Defendant's fraudulent concealment of the Product's worthless and harmful nature; *i.e.*, that it is completely unsuitable as an automotive motor oil. The deceptive and/or unfair practices alleged above are all aimed at doing precisely that: to conceal from Plaintiff and the Class that the Product (which Defendant markets as "automotive oil") is not suitable for use in automotive engines.

134.    Thus, the causes of action alleged herein were concealed from Plaintiff and the Class Members.

135.    The fraudulent means to achieve that concealment are documented herein (*see supra* ¶¶ 38-57). As noted throughout, the actions of Defendant go beyond mere non-disclosure, but comprise an overall scheme to actively and willfully conceal the worthless and harmful nature of its Product.

136.    Even though Defendant acknowledged as early as 2003 that non-additive oil was extremely harmful to automotive engines, it continued to sell the Product while misrepresenting to consumers it suitability for automotive engines.

137.     Defendant's 2003 acknowledgment occurred in a niche trade publication not accessed by the general public. Nor did it identify the Product by name. Further, though the 2003 article identified "Amalie", the Product label disguises Amalie's involvement, stating instead that the Product is manufactured by "XCEL Lubricants".

138.     Through its labeling, Defendant intentionally disguised its Product as that which it is not: automotive oil that protects automotive engines.

139.     Plaintiff and Class Members exercised reasonable care and diligence in seeking to discover the facts that form the basis of their claims. Due to Defendant's acts and omissions (including affirmative misrepresentations on the Product's label, reasonable consumers (including Plaintiff and Class Members) believed that Defendant's Product was suitable for use in automotive engines.

## DEMAND FOR JURY TRIAL

140.     Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and Members of the Class defined herein, prays for judgment and relief as follows:

A.     An order certifying that this action may be maintained as a class action;

B.     That the acts and/or omissions alleged herein be adjudged and decreed to be a deceptive, unfair and/or fraudulent business practice violating FDUTPA;

C.     That judgment be entered against Defendant and in favor of Plaintiff and the Class on the Plaintiff's FDUTPA claims, for actual damages and equitable relief (including restitution and/or restitutionary disgorgement);

35

D.      That judgment be entered against Defendant and in favor of Plaintiff and the Class

on Plaintiff's Misleading Advertising claim for actual damages;

E.      Restitution for Plaintiff and each Class Member in an amount equal to that in which

they unjustly enriched Defendant;

F.      An order enjoining Defendant from engaging in the deceptive, unfair, and/or illegal

acts or practices, as set forth in this Complaint, including but not limited to, an order

enjoining Defendant from selling the Product given that it has no legitimate use in

the market;

G.      Compensatory damages;

H.      Restitution and disgorgement of the unlawful profits collected by the Defendant;

I.      Prejudgment and post-judgment interest at the prevailing legal rate;

J.      Plaintiff's attorneys' fees and costs of suit; and

K.      Such other and further relief as the Court may deem necessary and appropriate.

DATED: June 14, 2018                        Respectfully submitted,

**KOZYAK TROPIN &**
**THROCKMORTON, LLP**

By:  *Harley S. Tropin*
Harley S. Tropin, Esq. (Fla. # 241253)
hst@kttlaw.com
Tal J. Lifshitz, Esq. (Fla. # 99519)
tjl@kttlaw.com
Robert Neary, Esq. (Fla. #81712)
rn@kttlaw.com
2525 Ponce de Leon Blvd., 9th Floor
Miami, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

*and*

1148771

**KANNER & WHITELEY, LLC**
Allan Kanner, Esq. (*PHV forthcoming*)
a.kanner@kanner-law.com
Cynthia St. Amant, Esq. (*PHV forthcoming*)
c.stamant@kanner-law.com
701 Camp Street
New Orleans, Louisiana 70130
Tel: (504) 524-5777
Fax: (504) 524-5763

*and*

**CASEY LAW FIRM, LLC**
Ryan Casey, Esq. (*PHV forthcoming*)
ryan@rcaseylaw.com
20 NE Thompson Street
Portland, Oregon 97212
Tel: (503) 928-7611
Fax: (503) 345-7470

1148771